

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-09-134-CV

IN THE INTEREST OF E.H., E.W.,
AND E.H.

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In three issues, Appellant Father complains that the evidence is factually insufficient to support the trial court's nonpaternity finding and its decision to terminate his parental rights under the endangerment grounds of section

------------

[1] ... *See* Tex. R. App. P. 47.4.

161.001(1).  *See* Tex. Fam. Code Ann. § 160.201 (Vernon 2001), § 161.001(1)(D), (E) (Vernon Supp. 2009).  We affirm.

## II.  Factual and Procedural History

The trial court terminated Mother's parental rights to six children and the parental rights of the children's fathers; Mother and the other fathers do not appeal.  Father is the alleged father of three of Mother's children:  Eileen, Eric, and Emily.[2]  Because Father challenges only the factual sufficiency of the evidence to support the trial court's termination findings, we will address the evidence in greater detail below.

## III.  Factual Sufficiency

### A.  Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  "While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional

---

[2] We use aliases for the names of the children.  *See* Tex. R. App. P. 9.8(b)(2).

and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear

3

and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Father violated subsection (D) or subsection (E) of section 161.001(1). *See* Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

B. Endangerment Findings

In his second and third issues, Father argues that the evidence is factually insufficient to support the trial court's findings that he endangered the children. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). Specifically, he contends that "[a]lthough there was evidence [Father] used and dealt drugs, the evidence that he used or dealt drugs around his three children was speculative [and] . . . [p]otentially dangerous is not endangering by clear and convincing evidence."[3] The State responds that there is ample evidence to support the trial court's finding that Father's extensive history of drug use and drug dealing endangered the children.

1. Endangerment under Section 161.001(1)(D), (E)

Endangerment is defined as exposing to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). To support a finding of endangerment, the parent's conduct does not necessarily

---

[3] ... Although the State argues that section 263.405(i) precludes Father's appeal, we have previously held section 263.405(i) unconstitutional. *See In re D.W.*, 249 S.W.3d 625, 640, 642–45 (Tex. App.—Fort Worth) (holding that section 263.405(i) is unconstitutional because it unduly interferes with the appellate court's substantive power to rehear and determine issues on the merits that were decided in the court below), *pet. denied*, 260 S.W.3d 462 (Tex. 2008). Furthermore, the Texas Supreme Court has also held that section 263.405(i) is unconstitutional "when it precludes a parent from raising a meritorious complaint about the insufficiency of the evidence supporting the termination order." *In re J.O.A.*, 283 S.W.3d 336, 339 (Tex. 2009).

5

have to be directed at the child, nor is the child required to suffer injury. *Boyd*, 727 S.W.2d at 533. Rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger that the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Under subsection (D), it is necessary to examine evidence related to the child's environment to determine if it is the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *In re J.L.W.,* No. 02-08-00179-CV, 2008 WL 4937970, at *6 (Tex. App.—Fort Worth Nov. 20, 2008, no pet.) (mem. op.); *see also In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) (stating that "environment" refers not only to the acceptability of living conditions, but also to the parent's conduct in the home).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act.

*J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *D.T.*, 34 S.W.3d at 634. "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *J.O.A.*, 283 S.W.3d at 345 & n.4; *see also In re S.K.A.*, No. 10-08-00347-CV, 2009 WL 2645027, at *9 (Tex. App.—Waco Aug. 19, 2009, no pet.) (mem. op.) (holding that father's failure to take any action to protect unborn child from mother's drug use was sufficient to establish that he knowingly allowed the child to remain in conditions and surroundings that endangered the child's physical well-being); *In re M.J.M.L.*, 31 S.W.3d 347, 351–52 (Tex. App.—San Antonio 2000, pet. denied) (holding that evidence of course-of-conduct endangerment was legally sufficient when it showed that father knew mother was a drug addict who used drugs while pregnant and that he abandoned soon-to-be-born baby to her care).

To determine whether termination is necessary, courts may look to parental conduct occurring both before and after a child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). Evidence of how a parent has treated another child or spouse is also relevant in determining whether there is an endangering course of conduct under section 161.001(1)(E). *D.T.*, 34 S.W.3d at 637. Drug abuse during pregnancy

7

constitutes conduct that endangers a child's physical and emotional well-being. *See In re W.A.B.*, 979 S.W.2d 804, 806 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (upholding termination when mother used illegal drugs during and after pregnancy), *disapproved of on other grounds, J.F.C.*, 96 S.W.3d at 267 n.39; *see also In re A.O.*, No. 02-09-00005-CV, 2009 WL 1815780, at *4–5 (Tex. App.—Fort Worth June 25, 2009, no pet.) (holding evidence legally and factually sufficient under subsections (D) and (E) when father used illegal drugs before going to prison, admitted to using cocaine with mother, and knew mother used illegal drugs during and after pregnancy but failed to take steps to protect child). Conduct that subjects a child to a life of uncertainty and instability also endangers the child's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) (using illegal drugs and violating parole provided sufficient evidence of endangerment). While imprisonment alone is not a basis to terminate a parent's rights, it is an appropriate factor to consider because when a parent is incarcerated, he or she is absent from the child's daily life and unable to provide support to the child, negatively impacting the child's living environment and emotional well-being. *See S.M.L.*, 171 S.W.3d at 478–79 ("Appellant's most recent assault on a police officer is particularly significant because he committed the crime knowing that, as before, it would result in his

incarceration, thus leaving his young daughter without his support and in the care of a mentally ill mother with questionable parenting abilities.").

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we may conduct a consolidated review. *In re M.C.T.*, 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.).

2. Evidence

Father did not attend the termination trial.[4] Dr. Nichelle Wiggins, a clinical psychologist who met with Father and Mother separately, testified at the trial, as did Penny Smith, a Child Protective Services ("CPS") investigator, Adelia Robertson, a Family Based Social Services ("FBSS") worker, and Ashley Moore, the ongoing CPS caseworker. Dr. Wiggins's reports on Father and Mother were admitted in evidence.

When Dr. Wiggins saw Father in December 2008 for his psychological evaluation, he was thirty years old and had a total of four children, ages eight, six, six, and one, with Mother and with another woman.[5] By the termination

---

[4] Mother did not attend the termination trial, nor did any of the other alleged fathers. The father of Mother's oldest two children was incarcerated and unable to attend. One of the alleged fathers signed an affidavit of relinquishment.

[5] According to Dr. Wiggins's report, Father became involved with Mother when the other woman went to jail. His six-year-old children are five months apart in age because when the other woman "got out of jail she got pregnant by him"; the other is Mother's. He was involved with the other

9

trial, Father had five children. Father married Mother in February 2008. The three children at issue here are the children with Mother: Eileen, born in 2002, Eric, born in 2007, and Emily, born in 2009.

Dr. Wiggins described Father's demeanor during his psychological evaluation as follows:

> [H]e told me he did not need to be seen by this examiner, and he used some choice words, profanity, . . . . He was true to himself throughout the interview, and he cursed quite frequently, so—and he didn't just use the milder versions of the words. He used some really strong words. So I just let him be himself, and, but I did find a need to quote some of his behaviors because it demonstrated some of the lack of impulse control and the social mores that were not being demonstrated. . . . *[T]his is the way he described himself—he says he does drugs, he sells drugs, and until he's ready to change, it will not happen*. [Emphasis added.]

She stated that Father said that he dealt drugs in 2008, but "[j]ust enough to make enough money. Nothing like he used to do." Her report states that Father sold drugs heavily from 1999 to 2003.

Father admitted to Dr. Wiggins that he had a drug problem and that he had been addicted to cocaine since he was fifteen. Dr. Wiggins testified that Father told her that his two drugs of choice were cocaine and heroin, that he

---

woman for eleven years and she is his eight-year-old's mother; their home was foreclosed upon when they were together. His six-year-old child with the other woman "was exposed to methadone because [she] was on methadone treatment while pregnant with him."

usually used them together, that he had used them the day before the evaluation,[6] and that he used them daily in amounts between $30- and $50-worth.  He added that he does not pay for the drugs; he asks for drugs from others with the promise to pay them back.  Dr. Wiggins described Father as stating:

> He only does heroin and cocaine, and that's in quotes, and he said he used in the form of speedballs, so he was minimizing at that point.  When somebody says ["]only[,"] and he's talking about heroin and cocaine, I knew then that I was dealing with a person who is saying ["]I have a drug problem but I don't have a problem in the way that CPS says I do, and I don't need to get the kind of treatment everybody is saying, but I do.["]  So he was so confused, but I'm not surprised by that, because that often goes along with people who are active in their addiction, so once that type of conversation starts, I'll try to find out, well, ["]how do you think it impacts the children, your drug use,["] and that's when he basically felt like he was doing those drugs to himself, the children were not being exposed to those drugs, so he can do whatever he wants to to his own body, but *he did not feel like he was harming his children.*  [Emphasis added.]

In her report, Dr. Wiggins noted that Father said his children never saw him use drugs and "when he used, he was in a different room."  He added that he did not think his selling drugs put the children in any danger and that his

_____

[6] Dr. Wiggins noted that six hours is usually enough time to complete her psychological evaluation unless the patient is cognitively slow, i.e., suffers from severe learning disabilities or a brain injury, or the patient is under the influence of drugs.  Father did not complete the evaluation that day, and he failed to return the following day to complete the evaluation.

drug use did not affect the children "because they don't do it." He told Dr. Wiggins that his step-children had seen him selling drugs, and that he was open to in-patient treatment but could not fit it into his schedule at the time. Dr. Wiggins recorded the following statement from Father about his relationship with the children:

> He stated his children know he loves each and every one of them. [Father] stated he and the children play together and go to parks and to the store together as well as they talk and laugh with each other. [Father] stated he knows his relationship with his children and stepchildren is wonderful. [Father] indicated the methods he uses when disciplining his children is have them stand in the corner, he spanks, uses time-out, restricts activities of any kind, and will have the older ones study all day.

Dr. Wiggins also testified that Father told her about his history of arrests and incarceration. He had been to jail about twenty-five times—including five possession-of-a-controlled-substance arrests in 2001, 2002, and 2003 (two charges dropped); an arrest for murder in 2001 (charge dropped); an arrest for assault (family violence) involving the other mother that resulted in two years' probation; and unlawfully carrying a weapon in 1996 and 2000. The 1996 weapons charge involved a cane that turned into a sword, which he used when he was "gang-banging."[7] Father and his mother "were locked up for possession

---

[7] ... Father was raised by his mother, who had an extensive drug history. He was eleven when he joined a gang but quit being active with the gang at seventeen. He started selling and using drugs at around age twelve; he took

of a controlled substance in April of 2003[;] his mother got [ten] years and he got five years." He was released in 2005 but went back seven months later for possession of heroin, for sixteen months. He was released in February 2007, went back to jail for a parole violation on July 26, 2008, was released August 22, 2008, and "got off parole and a leg monitor on September 19, 2008." Father was released from county jail on June 5, 2008, the day CPS removed the children from Mother for violating the safety plan.

Father described to Dr. Wiggins his history of anger outbursts and how he goes through cycles of depression;[8] he told Dr. Wiggins that "if his parental

---

care of his younger siblings with the money he would make selling drugs. He and his mother started using drugs together when he was nineteen. He did not finish high school, but he received his GED while incarcerated.

[8] ... Dr. Wiggins's report stated:

[Father] also endorsed a number of symptoms of anger such as still being angry about things that have happened to him in the past, feeling tense a lot of the time, people often telling him to calm down, getting angry really fast, and getting into frequent arguments. He also reported his anger sometimes frightens others and his anger has caused problems with the police before. [Father] indicated he has used alcohol and drugs to feel better when he's angry and yet, he denied needing help to manage his anger. [Father] also described severe mood swings but again it's unclear the extent the drug use has had on his current state of mind. [Father] reported . . . thoughts of death and dying quite a bit and his feelings can be easily hurt and he feels like others are not giving him proper credit for his achievements. [Father] at one point even indicated that he feels like walking away much like his father [did] . . . over his situation with his children . . . but he hangs in there

rights were terminated, he would act out in such a way to where the authorities would have to kill him." Dr. Wiggins stated that Father had a mood disorder and "a clear antisocial personality disorder . . . [h]e's narcissistic: The world is about him, what can he get out of relationships, lack of empathy, just very self-focused, very self-centered-type personality, and it comes out in his way he relates with others." She stated that a prime example of Father's narcissism was that "he does not see how his drug activity, drug problems, can have any effect on his children because it's all about him, he's doing it to himself, they're not harmed in any way." Dr. Wiggins noted that Father indicated he was willing to do anything he needed to get his children back, but his behavior indicated otherwise.[9]

---

and he keeps trying despite the fact that he is still using drugs. [Father] is a confused individual who is saying on the one hand he wants treatment but on the other hand his behaviors are indicating otherwise.

[9] ... Dr. Wiggins added that she was concerned for her safety during her interview with Father, stating,

I was cautious not to irritate him too much. With the way he was loose with his language and the threat he had made about if he doesn't get what he wants and his rights get terminated he's going to act out in such a way, so—and then he had told me he had used the day before, so irritability is real common, so I was careful with this man. . . . I did not want to irritate him and get him upset with me by telling [him] all these things I was going to recommend him to do, and that was the last thing he wanted to hear, because he didn't think he needed to be there to see me to begin with.

Moore, the ongoing CPS caseworker, testified that she spoke with Father about the service plan about six times and that Father was incarcerated for a parole violation for about a month while she had the case. She testified that Father attended eleven of around thirty possible visits with the children, that he arrived late to the visits on more than one occasion, and that he appeared to be under the influence of drugs at times. She testified that Father attended two of the individual counseling classes but that the therapist reported that Father was untruthful during these classes. Father did not complete a drug assessment. He attended only two parenting classes and participated in one drug test, although Moore requested five drug tests. The parties stipulated that Father's hair-follicle test was positive for cocaine, heroin, and other drugs on December 4, 2008. The termination trial occurred four months later, on April 13, 2009.

Moore testified that Father has not been able to show that he has a safe, stable, and appropriate home for the children[10] or any documentation that he is gainfully employed.[11] She testified that the children did not appear to be

---

[10] Dr. Wiggins's report reflects that Father lost his apartment in 2008 "because the [landlord] said he had too much traffic because he admitted to selling drugs 'a little in order to survive[.]'" By trial, he was living with Mother and his aunt in a one-bedroom apartment; the apartment is in his aunt's name.

[11] Dr. Wiggins's report stated that Father worked for a temporary staffing agency, assigned to a warehouse, and that this was his first

15

bonded with Father when he visited. She also testified that, with regard to both parents, she was concerned about "their ongoing drug use, the apparent refusal to participate in treatment, and the lack of services completed, their inability to maintain contact with [Moore], and their indifference to their visits." She testified that neither Mother nor Father could adequately provide for the children's physical, emotional, mental, and spiritual needs and that it would be in the children's best interest to terminate Mother's and Father's parental rights.

We must also review the evidence pertaining to Mother, because Father knowingly placed or knowingly allowed the children to remain with Mother, whose conduct and environment the trial court also found endangering. The trial court also found that Mother was the cause of a child being born addicted to alcohol or a controlled substance under family code section 161.001(1)(R). Eric and Emily were both born positive for cocaine.

Dr. Wiggins evaluated Mother, a thirty-two-year-old drug addict, in September 2008 and gave Mother's extensive, drug-related history at trial.[12]

---

"legitimate" job. He had been fired from a roofing job when he went to sleep on the roof "and was coming down off drugs when it happened . . . . [He] stated he had celebrated coming off the leg monitor and then went to work the first day on the job and was fired."

[12] ... Like Father's mother, Mother's mother had a drug problem—Mother's two younger brothers were born addicted to crack cocaine. Her mother's boyfriend started physically and sexually abusing Mother when she was eleven and impregnated Mother when she was thirteen; she had an abortion at

Mother described herself to Dr. Wiggins as a regular marijuana user and stated that she used marijuana, cocaine, and heroin two days before the psychological evaluation. Mother became involved with the father of her two oldest children when she was fourteen; he physically and emotionally abused her (including a concussion and fractured skull) and eventually went to jail for aggravated robbery with a deadly weapon when he was nineteen. When she was twenty-one, she became involved with the father of her third-oldest child and relapsed into drug use (cocaine and marijuana) when she was pregnant with that child; she described that man as a physically abusive crack cocaine user, but she added that she fought him back.

Mother's children with Father are six-year-old Eileen and eight-month-old Emily. She had a relationship with another man, a married crack cocaine user, while Father was incarcerated, and she told Dr. Wiggins that this man fathered her sixteen-month-old child, Eric. Mother admitted that Eric was born positive for cocaine and that she had been using cocaine and marijuana while pregnant because "[s]he was depressed . . . [and] could not believe that she was pregnant with yet another child." She was also charged with drug possession and went to jail during the pregnancy. Dr. Wiggins testified that Mother

fourteen. At sixteen, she was using drugs; she did not finish high school.

recognized that she was depressed and needed treatment for her addiction. Mother stated that she used cocaine daily in 2007, but she also stated that her children never knew she used drugs.

Dr. Wiggins testified that Mother admitted having been arrested for possession of marijuana and crack cocaine in 2001 and 2006 because she was selling drugs and trying to make some money, and that she had been to jail around six times. Mother has also been arrested for domestic violence. Dr. Wiggins described Mother as having mental health issues, including post-traumatic stress disorder from physical and sexual abuse, compounded by substance abuse issues. Mother also reported having auditory and visual hallucinations; Dr. Wiggins testified that she was unsure whether this was a psychotic episode or because of Mother's drug use.

Dr. Wiggins testified that Mother said she thought she and Father were doing a good job with the children and that this indicated that Mother was in denial because:

> This is a lady who has exposed her children to an environment in which there is drug use—even though she said they never saw her use, she was under the influence—and in her mind, because they were not being physically or sexually abused, she felt like she was giving them a different environment than her mother had given her . . . . I did not get [the] opportunity to visit with the children to see if that was accurate or not—but in her mind, because they did not have those experiences that she had, she felt like she was not being neglectful.

18

Dr. Wiggins gave similar testimony about Father, stating, "He did not connect [his and his mother's drug use] to his children, because he said he never used in front of his children, so he felt like since his children had not seen him use that he was giving them a different environment than his mother gave him."

Smith, the CPS investigator, testified that she met Mother in December 2007 after Eric tested positive for drugs at birth. She testified that Mother admitted using cocaine two weeks before giving birth. Robertson, the FBSS worker, met with Mother after Eric was born; Mother admitted to her that she had been using cocaine and marijuana and wanted help dealing with her dependency. Several months later, she located Mother at a Motel 6; Mother had Eric and two of her other children with her in violation of the safety plan. At that time, Mother admitted to using cocaine, opiates, and amphetamines. The children were removed and placed into foster care. Robertson testified that Mother never started any of the FBSS services although the agency offered to provide transportation for her.

Moore, the ongoing CPS caseworker, testified that she provided Mother with a service plan in August 2008, gave her a written copy of it twice, and discussed it with Mother approximately twelve times. Like Father, Mother failed to complete her service plan.

19

With regard to Father and Mother together, Dr. Wiggins testified that they exacerbated each other, and

> that was one of the things that was interesting, because both of them came from parents, mothers, who were drug abusers, and they described very similar types of environments. They had different outcomes in terms of one had been sexually and physically abused and the other went towards conduct disorders with gang activity, but they ended up both having emotional issues and substance dependence and legal problems.

She testified that the probability was high that both parents, who admitted to daily drug use, were under the influence of drugs when the children were around, and that she "would be very concerned about their ability to provide a safe home and parent their children effectively if they haven't gone through the treatment process." Dr. Wiggins testified that both Mother and Father admitted to selling drugs in 2008. She stated that Father told her that neither Mother nor Father could get an apartment in their names due to their criminal backgrounds. She stated that Mother told her that Father had gotten in trouble before for selling drugs but denied Father had ever used drugs.

### 3. Analysis

Father challenges the factual, but not the legal, sufficiency of the evidence to support the trial court's endangerment findings. Under the circumstances presented here—that is, Father's own history of drug use, drug

20

dealing, crime, and incarceration; his denial that his drug use and dealing affected the children; his knowledge that the other mother of his child used methadone while pregnant; and his leaving Eileen, Eric, and Emily (unborn when CPS intervened) in Mother's care, with her own history of drug use and crime—we conclude that the trial court could have reasonably formed a firm conviction or belief that Father endangered his children under subsections (D) and (E).  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *C.H.*, 89 S.W.3d at 28.  Therefore, we hold that the evidence is factually sufficient to uphold the trial court's endangerment findings.

## C.  Nonpaternity Finding

In his first issue, Father challenges the trial court's nonpaternity finding—specifically, he complains that the evidence is insufficient to support the trial court's finding that he did not admit or establish paternity because he acknowledged in his request for counsel that he was the children's parent and referred to himself as "Respondent Father" in his answer.  The State concedes that this would suffice to establish his paternity.  However, because of our resolution of his second and third issues, we need not address this issue.  *See* Tex. R. App. P. 47.1.

## IV. Conclusion

We affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY, GARDNER, and WALKER, JJ.

DELIVERED: February 11, 2010